## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**RICHARD JAMES SONNIER JR**          **CASE NO.  6:21-CV-00774**

**VERSUS**                            **JUDGE ROBERT R.
                                       SUMMERHAYS**

**COMMISSIONER OF SOCIAL**            **MAGISTRATE JUDGE CAROL B.
SECURITY**                            **WHITEHURST**

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and benefits

awarded.

## Administrative Proceedings

Claimant, Richard James Sonnier, Jr., fully exhausted his administrative

remedies before filing this action in federal court. He filed an application for

disability insurance benefits, alleging disability beginning on October 20, 2015. [1]

(Rec. Doc. 7-1, p. 405). His application was denied. He then requested a hearing,

---

[1] Claimant filed a previous application for disability benefits which was adjudicated and became
final on May 7, 2018. Claimant did not appeal. Therefore, his alleged onset date was established
as May 8, 2018. See Rec. Doc. 7-1 p. 3. Claimant does not challenge this finding.

which was held on June 15, 2020 before Administrative Law Judge Carolyn Smilie. (Rec. Doc. 7-1, p. 282 et seq). The ALJ issued a decision on August 6, 2020, concluding that Claimant was not disabled within the meaning of the Social Security Act from the claimed disability onset date through the date of the decision. (Rec. Doc. 7-1, p.11-24). Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. (Rec. Doc. 7-1, p. 5). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on June 27, 1986. He was 29 years old on the alleged disability onset date and 34 years old at the time of the ALJ's decision. He has a high school diploma, and his work history includes employment as a laborer for a metal shop and working offshore for a few months. He served in the Army from 2008 to 2013 and served 1 year in Iraq. (Rec. Doc. 7-1, p. 288-296). He alleged that he has been disabled since October 20, 2015, due to his mental health issues including post-traumatic stress disorder and anxiety resulting from his service in the war, as well as manic bipolar. (Rec. Doc. 7-1, p. 299-303). He also suffers from tinnitus (but he does not wear hearing aids), hypertension, and acid reflux. (Rec. Doc. 7-1, p. 304-

306). He admitted to being a heavy substance abuser at the time of the ALJ hearing. (Rec. Doc. 7-1, p. 306-07).

The medical records reveal an ongoing history of homelessness, arrests, substance abuse, and legal problems that can be traced to Claimant's significant history of mental illness, including bipolarism and multiple suicide attempts.

- Claimant contacted the VA National Suicide Prevention Hotline on December 8, 2015 with suicide ideation. He was scheduled for an appointment with a civilian provider but couldn't wait that long. He was referred to the Urgent Care clinic where he stated he was out of his medication and needed to be back on both before he returned to a state of depression. (Rec. Doc. 7-1, p. 990-92).

- Claimant began treatment with the VA in January 2016, noting a history of depression. In his first medical visit in May 2016, he reported anxiety and palpitations due to work and financial stress. He was not taking any medications at that time. He reported anger issue and possibly PTSD for which he requested a psychologist evaluation. He reported nightmares and the inability to sleep for days. (Rec. Doc. 7-1, p. 971-89).

- In May 2017, he sustained an avulsion fracture of his right 5th finger when it was crushed by a piece of oil field pipe casing. He has since been unable to bend that finger. (Rec. Doc. 7-1, p. 762; 967. See also Rec. Doc. 7-1, p. 308).

3

- In his first VA psychological evaluation with Dr. Gina Beverly on June 6, 2017, Claimant reported difficulty with prior providers, because he had a negative PTSD screen and Claimant did not like how he was treated by others. Otherwise, he had no history of mental health treatment. It was noted that Claimant's mother passed away when he was eight and that his father was not really in his life. His extended family helped to raise him. He briefly lived with his father, who he suspected was also bipolar, and emotionally abused Claimant. Claimant did not suffer from sexual or physical abuse. He had been in a relationship with his girlfriend for three years, though this was strained due to his emotional difficulties. They had a young son. Claimant was working offshore at the time. He reported being currently angry. He acknowledged physical injuries to his hands from hitting stuff, but he denied violence toward others or current suicidal or homicidal ideation. He also acknowledged a history of cutting himself after his mother died. Dr. Beverly referred him to Dr. Bush for a psychiatric evaluation. (Rec. Doc. 7-1, p. 801-03).

- On June 8, 2017, Claimant presented for an unscheduled appointment at the VA clinic appearing upset, tearful, and anxious. He reported having a verbal altercation with his co-workers and that he may lose his job. He denied suicidal or homicidal ideation and symptoms of psychosis. By the end of the

therapy session, his mental and emotional functioning were improved. He agreed to continue attending therapy. (Rec. Doc. 7-1, p. 956-57).

- Claimant's sister, who had taken an active role in trying to help him, called the VA on June 16, 2017 to report that Claimant had been arrested for domestic abuse after hitting his girlfriend. His girlfriend had told his sister that he "seemed different, like it wasn't him with a blank stare." Claimant reported not remembering the incident. His sister reported a history of anger and depression possibly stemming from their mother's death and subsequent unstable home life. His military service had made his symptoms worse. She described him as paranoid and easily angered. (Rec. Doc. 7-1, p. 954).

- Claimant presented to Dr. Bush on July 18, 2017 for a psychiatric evaluation. He was taking Trazodone, Venlafaxine, and Klonopin, with which he was compliant. He had been attempting to get help through the VA since 2015, but was turned down, making his symptoms worse. He reported two incidences of blacking out when he was unable to take Klonopin. After the second incident in which he hit his girlfriend, he was arrested, but he did not remember the incident. He had nightmares three nights a week about a fellow soldier that was hit in the face with shrapnel, causing him to wake up sweaty with heart racing. He had recently lost his job because he had gone six days without sleep, which he described as a common occurrence. He denied using

alcohol or drugs but admitted using marijuana when he had money. He reported an unstable childhood after his mother died when he was eight. He was homeless at the time. Following the evaluation, Dr. Bush determined that he was not in imminent danger and was a low risk of harm to himself and others. He was diagnosed with adjustment disorder, bipolar I disorder MRE mixed, and cannabis abuse. His medications were adjusted to include Carbazmaepine, Prazosin, titrate, and Klonopin. (Rec. Doc. 7-1, p. 797-99).

- Claimant consulted Drs. Bush and Beverly until an occurrence in August 2017 (Rec. Doc. 7-1, p. 921-28), wherein he was admitted to Longleaf Hospital, noted as unemployed and homeless, for suicidal ideations after his girlfriend broke up with him and he cut his forearm. The Longleaf records indicate he had been treating with the VA hospital for PTSD triggered by his time in Iraq. He served in the U.S. Army from 2008 through 2013. He since suffered from PTSD, nightmares, and depression. He was unable to work offshore because of his PTSD and flashbacks. He tested positive for benzodiazepine, cannabinoids, and opiates. He was diagnosed with major depressive disorder and PTSD and was discharged after eight days in a stable condition, with his mood improved from medications. (Rec. Doc. 7-1, p. 539-41). Emergency records from this incident indicate that he had threatened "suicide by cop" and was admitted pursuant to Physician Emergency Certificate (PEC). He was

6

noted as belligerent and violent and the police had to tase him. (Rec. Doc. 7-1, p. 617-29).

- In the months following his discharge from Longleaf, he reported doing well and staying with his aunt. He attended therapy with Dr. Beverly and worked on anger management. (Rec. Doc. 7-1, p. 910). He also continued to see Dr. Bush, who managed his medications. (Rec. Doc. 7-1, p. 905-06). By December 2017, he had been sentenced to one year probation for the earlier domestic battery and was again with his girlfriend, who was understanding of his issues. He reported to Dr. Bush that he was doing OK on medications, but he sometimes had trouble getting them due to financial issues. He was assessed as stable, not an imminent danger and at low risk of harming self or others. (Rec. Doc. 7-1, p. 725; 894-96). See also Rec. Doc. 7-1, p. 570-613 evidencing a history of anger management problems and bipolar disorder pre-dating his war service. He often struggled legally, financially, and in relationships.

- In the beginning of 2018, Claimant experienced a period of relative stability. In March 2018, he reported to Dr. Bush that he was compliant with his medications and that he was doing better under less financial stress. He was less irritable and had nightmares less often. He had cut back on cannabis use and was overall stable. (Rec. Doc. 7-1, p. 883-84). In June 2018, he expressed

frustration with not getting service connected for PTSD since he had combat exposure and financial troubles. He was compliant with his medication and suffered from nightmares about once a week with difficulty sleeping. He was assessed to be not an imminent danger to self or others and was at low risk for harm. (Rec. Doc. 7-1, p. 868-70).

- By late 2018, Claimant had again spiraled out of control. On August 22, 2018, Claimant called the VA call center and reported that he had cut his arms and blood was everywhere. After 1.5 hours of negotiation with emergency personnel, he escaped his apartment and was arrested. His sister, who had been called to the scene, stated that this was not his first suicide attempt and that he just wasn't getting better. She noted that he was on a lot of "mental medicines," which kept him from getting a job and made him more depressed, because he could not have a job. She was fearful something bad would happen if he didn't get help. (Rec. Doc. 7-1, p. 852-63). Thereafter, he was admitted to the Lafayette Behavioral Health Unit with PTSD, high blood pressure, and multiple lacerations of his left arm with tendon involvement from self-cutting. He was discharged after a week with medication. He remained with impulsivity, difficulty with anger control and sleeping. He was tearful and had no place to stay, because no one would take him in. (Rec. Doc. 7-1, p. 639-87).

8

- Claimant was flagged as at high risk for suicide in September 2018 after his hospitalization at Lafayette Behavioral Health. Immediately following his discharge, he indicated to the social workers that he was feeling like his old self as he had been taking his medication. In November 2018, the VA determined that Claimant was no longer at high risk for suicide. At that same time, he was noted as at imminent risk of homelessness and had mental health, financial, and housing needs that would benefit from intensive case management. (Rec. Doc. 7-1, p. 808-10; 833).

- VA records from September to October 2018 indicate Claimant has struggled with homelessness since 2007 and was only housed during his military service. He could not live with his girlfriend, who lived in government housing with three kids, or his brother, because they believed he was a danger to their children. (Rec. Doc. 7-1, p. 690-724).

- An October 26, 2018 VA Eligibility and Means Test found that he suffered from tinnitus as a rated disability, with 10% service connect. (Rec. Doc. 7-1, p. 759).

- May, June, and July 2019 VA notes indicate that Claimant remained on the facility's top 0.1% for statistical risk. (Rec. Doc. 7-1 p. 1685; 1697; 1699).

- Claimant was again hospitalized at Longleaf Hospital for 10 days in December 2018 for bipolar disorder and PTSD. He had been admitted per

9

PEC legal status after having an argument with his girlfriend and destroying her furniture because someone had brought drugs around the kids. He reported worsening depression due to increased life stressors including not trusting his girlfriend and her taking his kids away. He reported self-mutilating behaviors to feel better and increased sadness, anxiety, and poor sleep pattern. He was discharged to attend therapy groups and to remain medication compliant. (Rec. Doc. 7-1, p. 1002; 1614-22). Upon discharge he presented to Dr. Bush on December 31, 2018 with no acute issues. He had been living with his sister and was out of medication. He was unable to sleep. (Rec. Doc. 7-1, p. 1058).

- Beginning in January 2019, Claimant worked with the VA to attempt to locate housing with a VA voucher. He was also interested in seeking long term treatment for his issues. (Rec. Doc. 7-1, p. 1049-54). He later gave up his home voucher indicating that he would live with a friend. (Rec. Doc. 7-1, p. 1201).

- Claimant was admitted to the VA psychiatric hospital (9A) in February 2019 for 12 days after an incident at the homeless shelter. He had trace amounts of marijuana and was kicked out of the shelter. He became angry and felt that he was going to lose control. He had homicidal ideations during the confrontation and felt that he needed help. (Rec. Doc. 7-1, p. 1136-37; 1360-64). During his time, he requested a pastoral consultation with the chaplain, who provided

10

spiritual and emotional support. (Rec. Doc. 7-1, p. 1132). It was also noted in these records that, in addition to the previous hospitalizations noted above, Claimant had once tried to hang himself with an exercise band, but it snapped. (Rec. Doc. 7-1, p. 1233).

- Following his discharge in February 2019, Claimant advised a VA staff psychiatrist that he had been getting his life back together. He had been participating in his hobbies of working out and kickboxing and was not drinking or using illegal drugs. His thoughts were goal oriented with the goal of getting married. (Rec. Doc. 7-1, p. 1204-05).

- On March 18, 2019, Dr. Bush assessed Claimant's need for enhanced treatment and opined that he was receiving appropriate care for his diagnosis and current stressors. (Rec. Doc. 7-1, p. 1165). See also Rec. Doc. 7-1 p. 1703-04 wherein Claimant advised Dr. Bush that he was doing better. He was back with his girlfriend and taking care of his two-year-old son. He was compliant with his medication at that time. Dr. Bush recommended that he see Dr. Beverly again and attend the inpatient program at the Houston VA, but Claimant declined both.

- On May 17, 2019, Claimant presented to the Acadia General Hospital after taking four Klonopin to calm down and eating a small bag of meth so the police would not find it. He was again homeless. He left the hospital against

11

medical advice with a diagnosis of polysubstance abuse. (Rec. Doc. 7-1, p. 1398-1405).

- He went back to the emergency room on July 22, 2019 after he ingested 10 20mg tablets of Lisinopril and some Olanzapine. When asked why, he replied, "I don't want to talk about it." His girlfriend had called 911. He still felt suicidal. He arrived at the ER in a hypotensive state. He was diagnosed with intentional drug overdose and suicide attempt by multiple drug overdose and transferred to Lafayette General ICU. (Rec. Doc. 7-1, p. 1469). He was sent to River Place Behavioral Health Hospital thereafter, where he was inpatient for seven days. He told the staff there that he had be robbed and attacked several times recently, and that a robber had slit his throat, because he believed people thought he had medication and VA money. (Rec. Doc. 7-1 p. 1709).

- On November 4, 2019, Claimant again went to the Acadia General Hospital emergency room with lacerations of multiple sites of his left arm with tendon involvement. However, after being signed in, Claimant left, claiming he had his dog in the car. (Rec. Doc. 7-1, p. 1463-67).

- Most recent records from the VA show that Claimant's anger issues have not improved. See e.g. Rec. Doc. 7-1 p. 1732, wherein he verbally assaulted the nurse over the phone.

Also important to Claimant's history is a May 2, 2019 psychological report from Dr. John Tracy, state medical consultant, concluded in pertinent part: 1) Claimant was capable of understanding, remembering, and carrying out oral instructions; 2) his ability to sustain concentration to perform complex tasks was below normal; 3) his ability to relate to others, including supervisors and co-workers was below average; 4) his emotional ability and inability to modulate or express his anger in a socially appropriate manner would be disruptive to coworkers and prevent him from accepting criticism from supervisors; 5) his ability to tolerate stress and pressure associated with day-to-day work activity and demands is impaired; 6) considering his recurrent and severe depressive episodes and numerous psychiatric hospitalizations, he would likely decompensate if placed under the additional stress and demands of a typical work setting; and 7) his mental impairments would preclude him from focusing his attention and sustaining concentration, pace and persistence when performing simple and familiar tasks for extended periods. (Rec. Doc. 7-1, p. 1180).

Thereafter, a non-examining state consultant reviewed Claimant's medical records and found:

> Although mental MDIs have been established that can produce limitations and the clmt displays some symptoms, the clmt's symptoms do not appear to cause marked limitations. While it is believed that the clmt is currently able to complete tasks, the clmt would certainly function more effectively if he maintained sobriety and treatment compliance. The claimant's ADLs, PSCE and MER are only partially

consistent with the claimant's statements of limitations and do not suggest the same degree of severity.

(Rec. Doc. 7-1, p. 337).

Despite Claimant's history of being **hospitalized in a mental health facility five times within two years**, multiple suicide attempts, and the state's own examining medical consultant's opinion, the ALJ found Claimant was not disabled. Claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.   Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id*. (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173. A court must carefully examine the entire record but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Wren v. Sullivan*, 925 F.2d at 126.

## B.    Entitlement to Benefits

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. See 42 U.S.C. § 423(a).  See also *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019). A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

### C. **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled. The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do

his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

**D.    The ALJ's Findings and Conclusions**

The ALJ determined at step one that Claimant has not engaged in substantial gainful activity since May 8, 2018. (Rec. Doc. 7-1, p. 17). This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Claimant has the following severe impairments: tinnitus, post-traumatic stress disorder, major depressive disorder, and substance abuse disorder. (Rec. Doc. 7-1, p. 18). This finding is supported by substantial evidence in the record.

At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Rec. Doc. 7-1, p. 19). Claimant does not challenge this finding.

The ALJ next found that Claimant has the ability to perform a full range of work at all exertional levels with non-exertional limitations that account for his mental impairments. (Rec. Doc. 7-1, p. 19). Claimant challenges this finding.

At step four, the ALJ found Claimant is unable to perform past relevant work. Claimant does not challenge this finding.

At step five, the ALJ found Claimant is capable of performing certain jobs which exist in significant numbers in the national economy. Claimant challenges this finding to the extent he challenges the ALJ's RFC finding.

### E.    <u>The Allegations of Error</u>

Claimant asserts a single assignment of error: The RFC determination lacks substantial evidence because the ALJ improperly evaluated the opinion evidence of consultative examiner, John M. Tracy, PhD.

18

**F.**    **Whether the ALJ's RFC finding is based on substantial evidence.**

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record." *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).The ALJ is responsible for determining a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations. *Martinez v. Chater*, 64 F.3d at 176. The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983). In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

Claimant challenges the ALJ's RFC opinion insofar as it failed to rely on the opinions of state consultative examiner, Dr. Tracy. Dr. Tracy's opinions, set forth above, would necessitate a finding that Claimant is disabled. Claimant's application for benefits was filed after March 17, 2017.  Therefore, the ALJ's duty to weigh medical opinions is governed by 20 C.F.R. 404.1520c. The regulations state that "[w]hen a medical source provides one or more medical opinions…, we will consider those medical opinions … from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." 20 C.F.R. § 404.1520c(a). The factors to be considered are the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and any other factor which the claimant brings to the court's attention. 20 C.F.R. § 404.1520c(c)(1-5). The two most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2).  With regard to supportability, the regulation states that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)…, the more persuasive the medical opinions…will be." 20 C.F.R. § 404.1520c(c)(1). With regard to consistency, the regulation states that "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the

medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2). Thus, the ALJ was required to consider all of the medical opinions, focusing primarily on the supportability and consistency of each opinion. Further, an ALJ is required to consider all of the evidence in the record and cannot "pick and choose" only the evidence that supports his position. *Loza v. Apfel*, 219 F.3d at 393.

The ALJ found the May 7, 2019 opinion of non-examining state agency psychological consultant to be more persuasive than the May 2, 2019 opinion of Dr. Tracy, the state's consultative examiner who met with and evaluated Claimant. In favoring the non-examining consultant's opinion over Dr. Tracy's conclusion, the ALJ stated: "[I]n my view the longitudinal medical evidence of record does not suggest the degree of limitation expressed by the consultative examiner." (Rec. Doc. 7-1, p. 21). Contrary to the ALJ's opinion, this Court's review of more than 2,000 pages of records confirms that the medical evidence is wholly in line with Dr. Tracy's opinions.

Although the ALJ further relied on "substantial variances between the evidence and the claimant's allegations," she did not identify any specific instance where either the allegations or Dr. Tracy's opinion differed from the medical evidence.

The ALJ further concluded that "he seems to do relatively well when compliant with his medications and avoiding substance use." (Rec. Doc. 7-1, p. 19;

21). The state non-examining consultant's opinion, upon which the ALJ relied, was also based on this observation. (Rec. Doc. 7-1, p. 337). However, a claimant's failure to follow prescribed medical treatment will preclude an award of benefits only if the claimant lacks a good reason for failing to comply. 20 C.F.R. § 416.930; *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990). One such "good reason" might be an inability to pay for the recommended treatment. SSR 16-3p, 2016 WL 1119029, at *8-9. *Villa v. Sullivan*, 895 F.2d at 1024 ("although a condition that can be remedied by treatment is not disabling, a person unable to afford such treatment is considered disabled. See *Lovelace v. Bowen*, 813 F.2d at 59; *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986)."). "[T]he medicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered." *Lovelace v. Bowen*, 813 F.2d at 59. Additionally, non-compliance that results from a mental impairment may be a justifiable reason for failing to follow prescribed treatment. See *Burns v. Astrue*, 5:07-CV-182-C ECF, 2008 WL 2191303, *4-5 (N.D. Tex. May 27, 2008); *Brashears v. Apfel*, 73 F.Supp.2d 648, 651 (W.D. La. 1999) (citations omitted); *Grossweiler v. Barnhart*, No. SA-02-CA-903-RF, 2003 WL 22454928 at *2 (W.D. Tex. Sept. 30, 2003) (acknowledging that "'federal courts have recognized that a mentally ill person's noncompliance with psychiatric medications could be the result of [the] mental impairment and, therefore, neither willful nor without a justifiable excuse.'") (citations omitted). The record is replete

with evidence of Claimant's inability to get his prescribed medications due to financial hardship and homelessness. See e.g. Rec. Doc. 7-1, p. 570-613; 725; 894-96.

The ALJ also alluded to Claimant's substance abuse as evidence that Claimant is not trying hard enough to mitigate his symptoms; however, the ALJ failed to evaluate whether the claimant would be disabled by his conditions even if he were not using marijuana and other substances.[1]

The ALJ described the record as demonstrating that "he typically will go for lengthy periods during which his functioning is at baseline, but will suffer an acute decompensation relating to one or more life events, and after a short period of treatment will resume baseline functioning." (Rec. Doc. 7-1, p. 21-22). The ALJ's summation grossly mischaracterizes the substantial medical evidence of Claimant's significant history of bipolarism, manic depression, and PTSD, resulting in five mental health hospitalizations in less than two years and multiple suicide attempts. Such history more than supports Dr. Tracy's opinion that Claimant is incapable of working in any work setting.

---

[1]    20 C.F.R. § 404.1535 describes the process for determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability.

The Court agrees with Claimant that the ALJ's opinion is not supported by substantial evidence in the record. Thus, the Court finds that the ALJ's decision must be reversed.

## Conclusion and Recommendation

This Court finds that the ALJ failed to properly evaluate Claimant's residual functional capacity. When considering the overwhelming evidence of Claimant's mental impairments and the resulting detrimental effects on his ability to work, as found by Dr. Tracy, this Court concludes that the claimant is disabled. Thus,      this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions that the claimant's applications for Disability Insurance Benefits be granted and for computation and payment of an award of benefits beginning on the alleged disability onset date, May 8, 2018. Inasmuch as the reversal recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[2]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of

---

[2]      See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[3]

Signed in Lafayette, Louisiana, this 16th day of February, 2022.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE

---

[3]     See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).